**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 20-218 |
| KRESSMORE J. WATSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Presently before the Court is the Government's motion pursuant to 18 U.S.C. § 3145(a)(1) seeking revocation of a release order issued by United States Magistrate Judge Rozella A. Oliver in the Central District of California, which is opposed by Defendant Kressmore J. Watson.  (*See* Docket Nos. 101, 387, 397).  After careful consideration of the parties' positions, review of the detention hearing transcript, the referenced Pretrial Services Report and addendum thereto, and additional evidence submitted by the parties at the hearing held on December 14, 2020, (Docket Nos. 389, 439-1), the Government's motion will be granted and detention will be ordered.  In addition to the reasons stated on the record at the December 14th hearing, the following includes the Court's findings of fact and additional statement of the reasons for detention as required by 18 U.S.C. § 3142(i)(1).

I.      **BACKGROUND**

A.  **PROCEDURAL HISTORY**

On August 25, 2020, Defendant and 26 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and

1

around October 2018 until in and around June 2020.  (Docket No. 3).  An arrest warrant was issued for Defendant on that same date.  (Docket No. 33).

As outlined in the Government's motion, Defendant was arrested in the Central District of California on September 2, 2020.  (Docket No. 101 at 2).  Following Defendant's arrest, he had an initial appearance and detention hearing before Magistrate Judge Oliver, who entered an order releasing him on a $50,000 appearance bond with travel limited to the Central District of California and the Western District of Pennsylvania among other conditions.  (Docket No. 389 at 9-10).  Magistrate Judge Oliver issued a 48-hour stay of the order of release to permit the Government to file a motion to revoke the release order.  (*Id.* at 11).

On September 4, 2020, the Government filed with this Court an emergency motion for a stay and revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1).  (Docket No. 101).  In sum, the Government represented that Defendant "is subject to a rebuttable presumption in favor of detention.  He is unable to rebut it.  The charges against him are serious, his involvement in the conspiracy was significant, and the weight of the evidence is strong.  [Defendant] has a prior felony drug conviction, and his drug-trafficking activity represents his only tie to the Pittsburgh area, where this case is pending.  [Defendant's] release would pose a serious danger to the community. It would also give rise to an intolerable risk of flight, which could be aided by several conspirators who have thus far managed to evade law enforcement."  (*Id.* at 10).  The Court granted the Government's motion as to its request that the release order be stayed and further ordered that Defendant shall remain in the custody of the United States Marshals Service and be transported forthwith to the Western District of Pennsylvania for further proceedings on the Government's request that he be detained pending trial or other disposition.  (Docket No. 103).

Following Defendant's arrival in this District, he was arraigned on November 5, 2020 and pled not guilty to the charge. (Docket Nos. 341, 342). The parties were then ordered to file a status report concerning the manner in which they wished to proceed on the Government's motion to revoke the release order. In response, the parties indicated that they would like to submit briefs on the matter, proposed a briefing schedule which the Court adopted, and Defendant requested a hearing which was held by video conference on December 14, 2020. (Docket Nos. 373, 439).

On November 30, 2020, Defendant filed his brief in opposition to the Government's motion to revoke, in which he concedes that the rebuttable presumption of detention applies in this case, but he contends that he is not a flight risk or a danger to the community. (Docket No. 387 at 7, 10). In support of his position, Defendant argues that: he has a minimal criminal history; he has resided in Los Angeles, California since 2002 and has significant family ties to that area, including his two young children and his mother, who has agreed that he can reside with her if he is released; he was previously employed as a club/party promoter prior to the COVID-19 pandemic, and his support network in California will assist him in finding employment in he is released; despite having some relatives in Jamaica, he does not engage in an excessive amount of international travel; and he is willing to relinquish his United States passport. (*Id.* at 10-12). Defendant also submitted letters from his mother, Keffer Isaac, and stepfather, Rudolph Biddle, confirming that he can live with them if he is released and they will ensure that he attends scheduled court proceedings, as well as a letter from a family friend, Judith Wilson, attesting to his good character. (Docket Nos. 387-1, 387-2).

On December 7, 2020, the Government filed a memorandum in support of its motion to revoke the release order, explaining that this case arises from the investigation of a drug trafficking organization ("DTO") allegedly responsible for distributing more than 100 kilograms of cocaine

which was obtained from a source of supply in Mexico and sold by DTO members operating in Pennsylvania, California, Arizona and other states.  (Docket No. 397 at 6).  According to the Government, Defendant acted as a courier and distributor of multi-kilogram quantities of cocaine for the DTO.  (*Id.*).  The Government argues that Defendant must be detained pending trial because the rebuttable presumption applies in this case based on the charge he faces, consideration of the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of detention, and there is no condition or combination of conditions which will reasonably assure his appearance as required and the safety of the community if he is released.  (*Id.* at 11-15).  Along with its memorandum, the Government submitted the following exhibits which were admitted into evidence as Government's Exhibits 1, 2 and 3 at the December 14th hearing:  (1) Special Agent Christopher J. Kline's Affidavit dated March 20, 2020 In Support of an Application for an Order Authorizing the Interception of Wire and Electronic Communications ("Govt. Ex. 1"); (2) a surveillance photograph purportedly of Defendant ("Govt. Ex. 2"); and (3) Special Agent Adam Gaab's Affidavit dated August 31, 2020 In Support of Search Warrants by Telephone or Other Reliable Electronic Means ("Govt. Ex. 3"). (Docket No. 439-1).

## B.  **EVIDENCE ADDUCED AT THE HEARING**[1]

At the December 14th hearing, the Government relied on the testimony of Drug Enforcement Administration Special Agent ("SA") Michael Johns, who is one of the lead agents in the investigation of this case.[2]  SA Johns' testimony was based on his personal knowledge,

---

[1]     An official transcript of the hearing has not been produced as of this date.  Therefore, the Court summarizes the testimony presented from its notes of the proceeding and by reference to an unofficial draft of the transcript.

[2]     SA Johns testified that during his career with the DEA which began in 2002, he has participated in investigations ranging from street-level drug dealing to high level narcotics trafficking, as well as Title III wiretap investigations, and he is familiar with communication modes and methods utilized by DTOs.  In this Court's estimation, SA Johns presented as an experienced agent and, based on his demeanor and testimony in response to the questioning of the attorneys, he offered credible testimony concerning the investigation of this case.

including his review of Title III wiretap intercepts, and information relayed to him by other investigating agents.

By way of background, SA Johns explained that the investigation focused on the trafficking of cocaine from Mexico into the United States, including Pennsylvania, Los Angeles, California and Tucson, Arizona.  Relevant here, co-defendant Jamaal Maragh was identified as the main operative for the DTO in the Pittsburgh area.  Two of Maragh's telephones were the subject of Title III wiretaps between November 2019 and June 2020.  During that time, agents intercepted communications between Maragh and an unidentified source of supply located in Mexico discussing arrangements for drugs to be transported to California.  Members of the DTO then shipped drugs from California to Pittsburgh through the United States mail or by couriers driving tractor-trailers.

Through SA Johns' testimony, the Government entered into evidence Exhibits 1, 2 and 3. SA Johns first testified concerning Government Exhibit 3, which is a search warrant affidavit by one of the other lead case agents, SA Gaab of the United States Postal Service – Office of Inspector General ("USPS-OIG").  SA Johns testified that he reviewed SA Gaab's search warrant affidavit and it was true and accurate based on his knowledge of the investigation.  SA Gaab's affidavit includes a description of the manner in which the DTO used the United States mail to ship suspicious appearing parcels from California to Pittsburgh.  (*See* Govt. Ex. 3, ¶ 46).  The parcels in question usually were shipped by priority mail, weighed between 4 and 25 pounds and were paid for in cash.  (*Id.*, ¶ 47).  Although agents observed the characteristics of many parcels during the investigation, they intercepted, seized and searched ten parcels associated with Maragh and the DTO, which contained a total of 15 kilograms of cocaine and approximately $50,000.  (*Id.*, ¶¶ 14, 46).

SA Johns testified that a chart set forth in SA Gaab's affidavit contained information about those ten parcels, including the date each parcel was seized, the sender's name, the recipient's name, the parcel's contents and "cellular tracking inquiries." (*See* Govt. Ex. 3, ¶ 48). "Tracking inquiries" refer to the process of obtaining information about the IP address associated with an electronic device used to track a package shipped through the United States Postal Service. (*Id.*, ¶ 48, n.8). In this case, cellular service providers responded to subpoenas and supplied information which enabled law enforcement to determine the device that was used to track the various parcels, thereby allowing law enforcement to identify the individual associated with a particular device. (*Id.*). Based on that information, agents concluded that Defendant conducted tracking inquiries on parcel # 7, # 8 and # 9. (*Id.*, ¶¶ 48, 43).

As detailed in the chart and explained by SA Johns, Defendant utilized telephone number (213) 820-7688 to track parcel # 7.[3] (Govt. Ex. 3, ¶ 48). Additionally, two cellular telephones associated with Maragh were used to track that parcel. (*Id.*). Parcel # 7 was seized on January 15, 2020, searched pursuant to a warrant and found to contain two kilograms of cocaine. (*Id.*). According to SA Johns' testimony, photographs of the seized cocaine attached as exhibits to SA Gaab's affidavit show that it was labeled "Gucci" and "Marvel," and the Gucci logo also was imprinted in the powder cocaine. (*See id.* at 94-96). SA Johns explained that the labels on the cocaine were significant because law enforcement heard members of the DTO discuss them during intercepted calls.

SA Johns also testified that Defendant tracked parcel # 8 and # 9, which were mailed from Los Angeles to Pittsburgh, as described in the chart. (Govt. Ex. 3, ¶ 48). The two parcels were

---

3       SA Johns testified that agents determined Defendant used telephone number (213) 820-7688 by conducting physical surveillance in conjunction with location monitoring of that telephone number, which showed that the telephone followed Defendant's movements.

seized on March 20, 2020, searched pursuant to a warrant and each were found to contain two kilograms of cocaine.  (*Id.*).  A photograph of cocaine seized from those parcels is attached as an exhibit to SA Gaab's affidavit.  (*See id.* at 98).  SA Johns explained that Defendant conducted tracking inquiries on parcel #8 and # 9 using a static IP address related to an in-home WIFI network linked to him.  More specifically, agents determined that the IP address was connected to an account subscribed to Keffer Isaac located at an address on W. 57th Street in Los Angeles with an associated email address of kress-dawg@att.net.  (*Id.*, ¶ 48, n.9).  As described in SA Gaab's affidavit and explained by SA Johns, based on physical surveillance and location information associated with telephone number (213) 820-7688, agents determined that Defendant resided at the W. 57th Street address when the tracking inquiries were conducted.  (*Id.*).

SA Johns next testified concerning Government Exhibit 1, which is a wiretap affidavit by another of the lead case agents, SA Kline of the USPS-OIG.  During the investigation, Defendant and other members of the DTO were intercepted over Title III wiretaps. Based on the intercepted communications, agents believe that Defendant has a close relationship with Maragh, who they believe has fled from the United States.

According to SA Johns' testimony, agents intercepted a call on March 5, 2020 from Maragh, using Target Telephone ("TT") # 1, to an unidentified male, who agents believe was the DTO's source of supply in Mexico.  During that call, Maragh ordered 17 kilograms of cocaine from the unidentified male.  (*See* Govt. Ex. 1, ¶¶ 132, 133).  On March 6, 2020, agents intercepted a call between Maragh, utilizing TT # 1, and co-defendant Johnny Bravo, using TT # 7.  (*Id.*, ¶ 134).  During this call, Maragh confirmed that he wanted Bravo, who was based in Los Angeles and served as a courier of drugs and currency for the DTO, to deliver 17 kilograms of cocaine to him.  (*Id.*, ¶¶ 39, 134, 135).  In a subsequent intercepted call between Maragh and Bravo on March

6th, they discussed the "17," Bravo said he would bring a "big ass bottle of liquor," and Maragh instructed him to take it to "Marlo." (*Id.*, ¶ 136). SA Johns testified that agents knew that "Marlo" referred to an apartment complex on New Hampshire Avenue in Los Angeles which was used by members of the DTO. (*See id.*, ¶ 137).

After interception of the calls between Maragh and Bravo, agents established surveillance at the apartment complex, which SA Johns listened to by radio. As detailed in SA Kline's affidavit and recounted by SA Johns, surveilling agents observed the following: Defendant exited the apartment complex through the main door and he walked with an unknown black male out of view; a white van driven by Bravo, accompanied by an unidentified Hispanic male passenger, entered the subterranean parking lot at the apartment complex; Defendant and the unknown male walked into the parking lot behind the van and out of view; the van driven by Bravo with the unidentified passenger left the parking lot; Defendant walked out of the apartment complex's main door carrying a large green and red pinata in the shape of a liquor bottle; and Defendant entered the driver's seat of a Toyota vehicle which was determined to be registered to Keffer Isaac and left the area. (Govt. Ex. 1, ¶ 137). During this surveillance, agents took a photograph of Defendant standing outside of the apartment complex as shown by Government Exhibit 2. SA Johns testified that he recognized Defendant as the individual in the photograph and explained that he had identified Defendant by his driver's license photograph.

SA Johns testified that the surveilling agents' observation of the liquor bottle shaped pinata was significant because Bravo had told Maragh on one of the intercepted calls that he would bring a "big ass bottle of liquor." As SA Johns testified and as averred by SA Kline in the affidavit, based on the intercepted communications and surveillance, agents believe that Bravo delivered to Defendant 17 kilograms of cocaine, which were stored in the pinata. (Govt. Ex. 1, ¶ 138).

8

Finally, SA Johns testified concerning calls intercepted on February 20, 2020 between Bravo, using TT # 6, and Defendant using telephone number (213) 820-7688, during which they discussed the amount of money Defendant had for Bravo. (*See* Govt. Ex. 1, ¶¶ 188, 189). During the call between Bravo and Defendant, Maragh used TT # 4 to call Defendant on telephone number (323) 378-9109, which agents believed was a secondary telephone utilized by Defendant based on calls intercepted during the investigation.[4]   (*Id.*, ¶ 190).   According to SA Johns, this communication was significant because Maragh told Defendant to give Bravo the "28," which is a reference to drug proceeds. (*See id.*).  In subsequent intercepted communications, Defendant and Bravo coordinated a meeting to pick up drug proceeds, and Bravo later advised Maragh that he collected $240,000 from Defendant. (*Id.*, ¶¶ 191, 192).

Following the Government's presentation at the hearing, Defendant proffered evidence consisting of background information from the Pretrial Services Report and the letters from his mother, stepfather and Ms. Wilson which were previously filed on the docket. (*See* Docket Nos. 387-1, 387-2).

After reviewing the transcript of the detention hearing before Magistrate Judge Oliver, considering the Pretrial Services Report and addendum thereto, the supplemental information and evidence presented at the hearing and the arguments of counsel, and for reasons stated at the hearing and further detailed here, the Court concludes that there is no condition or combination of conditions which will reasonably assure Defendant's appearance as required and the safety of the community if he is released.

---

4       SA Johns testified that it is common for individuals involved in drug trafficking to use more than one telephone.

## II.    LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings.   Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ."   A district court exercises *de novo* review over a release order entered by a magistrate judge.[5]   *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).   A district court may incorporate the transcript of the proceedings before the magistrate judge, as this Court did at the December 14th hearing.   *See United States v. Chagra,* 850 F. Supp. 354, 357 (W.D. Pa. 1994).   The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it has done here.[6]   *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the

---

5       Although the Court held a hearing in this case, it is well-established that "[d]e novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing."   *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.").

6       As noted, the Court has considered the Pretrial Services Report prepared in the Central District of California and the addendum thereto.   Neither party has objected to the contents of this Report, other than Defendant's disagreement with the original recommendation of the Pretrial Services Office that there is no condition or combination of conditions that can be fashioned to reasonably assure his appearance and thus he should be detained pending trial or other disposition of this matter.

community."  18 U.S.C. §3142(b).  Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered.  18 U.S.C. §3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3).  This rebuttable presumption applies, among others, to cases in which there is probable cause to believe that the defendant committed an offense under the Controlled

Substances Act, 21 U.S.C. § 801, *et seq.*, for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A). An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption. *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . . that he will appear and will not pose a threat to the community." *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). The defendant's burden of production is relatively light and has been construed as easy to meet.[7] *Chagra*, 850 F. Supp. at 357 (citation omitted). If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Id.* at 358 (citation omitted). If the defendant rebuts the presumption, the burden of persuasion remains with the Government. *Id.* at 357. Thus, the Government bears the burden of proving that the defendant presents either a risk of flight or a danger to the community.[8]

## III.  **DISCUSSION**

As an initial matter, Defendant is charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which carries a penalty of not less than ten years and up to life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(ii). This charge raises the rebuttable presumption that no condition or combination of conditions will

---

7    To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted). This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'" *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

8    The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that no condition or combination of conditions will assure his appearance at trial. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986). The Government must prove by clear and convincing evidence that the defendant is a danger to the safety of any other person or the community. *Delker*, 757 F.2d at 1399.

reasonably assure Defendant's appearance and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).  Defendant does not dispute that the rebuttable presumption applies in this case. (*See* Docket No. 387 at 7).

As outlined in his brief, Defendant attempts to rebut this presumption by proffering evidence that his criminal history is minimal, he has significant family ties to the Los Angeles area where he has resided since 2002, he previously was gainfully employed as a party promoter prior to the COVID-19 pandemic and he will seek employment if released, despite some family ties to Jamaica, he does not engage in frequent international travel and he is willing to relinquish his passport.  (Docket No. 387 at 10-12).  Overall, Defendant maintains that his background and characteristics demonstrate that he is not a danger to the community or a flight risk.  (*Id.* at 10). Additionally, Defendant submitted letters from his mother, Ms. Isaac, and stepfather, Mr. Biddle, confirming that he can live with them if he is released and they will ensure that he appears at court proceedings, as well as a letter from Ms. Wilson attesting to his good character.  (Docket Nos. 387-1, 387-2).

Even if Defendant's proffered information and evidence satisfies his burden to rebut the applicable presumption, the Court nonetheless concludes that the Government has presented clear and convincing evidence that Defendant is a danger to the safety of the community and has proven by a preponderance of the evidence that he is a flight risk.  In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g).  For reasons that follow, the Court finds that the available information and proffered evidence on each of those factors weigh in favor of detention.

A.  **Nature and Circumstances of the Offense Charged**

The Government submits that this case arises from the investigation of a DTO which was

responsible for distributing more than 100 kilograms of cocaine that was obtained from a source of supply in Mexico and sold by members of the organization in Pennsylvania, California, Arizona and other states. (Docket No. 397 at 6). For Defendant's part, he allegedly acted as a courier and a distributor of multi-kilogram quantities of cocaine and was an associate of co-defendant Maragh, who was the organization's head of operations in the Pittsburgh area. As a result of Defendant's alleged involvement, he has been indicted on a charge of conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which is a very serious controlled substance offense. (Docket No. 3). If convicted, he faces a statutory mandatory term of not less than 10 years and up to life imprisonment. In light of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

### B.  Weight of the Evidence

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the  Indictment which establishes probable cause that the offense occurred. More specifically, while Defendant is presumed innocent of the charged offense, the Government's evidence presented at the hearing strongly suggests that Defendant was not only involved in the conspiracy, but he played an important role in the DTO.

As summarized above, SA Johns' testimony concerning investigative techniques utilized by the USPS-OIG, Title III wiretap intercepts and surveillance conducted during the investigation, along with Government Exhibits 1, 2 and 3, show the following: in January and March 2020, agents intercepted three parcels, each containing two kilograms of cocaine, that were shipped in the United States mail from California to Pittsburgh and which had been electronically tracked by a cellular telephone number or other device utilizing an IP address that was associated with Defendant; in February 2020, Defendant coordinated with co-defendants Bravo and Maragh to

facilitate the transfer of $240,000 in drug proceeds; and, in March 2020, Defendant worked in conjunction with co-defendant Bravo to effectuate the delivery of 17 kilograms of cocaine in Los Angeles, which Maragh had ordered from the DTO's source of supply in Mexico.  All told, the Government possesses substantial evidence of Defendant's involvement in the DTO, particularly as to the events of January, February and March 2020.  In sum, while recognizing that Defendant is presumed innocent of the charged offense, the weight of the evidence against Defendant favors pretrial detention.

### C.  <u>History and Characteristics of Defendant</u>

As to Defendant's background and characteristics, he is 35 years old, he was born in Jamaica, he came to the United States in 2002 and became a citizen in 2008.[9]  Since coming to the United States, Defendant has resided in the Los Angeles, California area with his mother, who the Pretrial Services Officer spoke with to corroborate his background.  Most recently, Defendant has lived with his mother and stepfather at an address on West 57th Street in Los Angeles for the past three years.  He has four half-siblings, three of whom reside in New York and one in Jamaica. Although Defendant has never been married, he has two young children, who reside with their respective mothers.  He is involved in his children's lives and helps them financially.  Overall, Defendant reported that he considers himself close to his family members.  Ms. Wilson, who has known Defendant since 2005, describes him as a loving son and father who will do his best for his mother and children and further attests that he is a kind, decent person who is always willing to help those in need.

---

[9]     Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are detailed in the Pretrial Services Report.

Defendant describes his physical and mental health as good.  The Pretrial Services Report does not indicate that Defendant has any current substance abuse problems, but he has tried marijuana in the past on an infrequent basis and he drinks alcohol on occasion.

Since the onset of the COVID-19 pandemic, Defendant has been unemployed and has received unemployment compensation and financial assistance from his mother.  As noted, he previously worked for approximately 10 years as a club and party promoter in the Los Angeles area.  Defendant submits that his network of supporters in California "is prepared to assist him in finding employment, on an immediate basis" if he is released.  (Docket No. 387 at 12).  Although it is laudable that Defendant's supporters would try to help him, presently there is no information concerning a prospective job opportunity or what any proposed employment would entail.  Absent the prospect of available legitimate employment, the Court is concerned that Defendant could be lured into returning to the drug trafficking activity with which he has been charged.[10]

Turning to Defendant's criminal history, while not extensive, this is not his first brush with the law.  According to the Pretrial Services Report, Defendant was convicted in 2009 of selling/furnishing marijuana/hash, which is a felony, and was sentenced to three years' probation, 180 days in jail.  Defendant submits that he attended all court appearances in that case, which demonstrates that he is not a flight risk.  (Docket No. 387 at 10).  Although the Court accepts Defendant's representation that he appeared as required for court proceedings in his prior case, it is significant that the penalty he faces in the present case is far more severe.  In the prior case, Defendant was convicted of a state felony and sentenced to 180 days' imprisonment and three

---

[10]     This concern is exacerbated by Defendant's limited financial resources.  As outlined in the Pretrial Services Report, Defendant has approximately $2,000 in a bank account and owns a vehicle valued at $21,000, but has no other assets, while his monthly expenses consist of car insurance of $268, court-ordered child support payments of $480, and some financial assistance to his mother for housing expenses.  In this Court's estimation, the combination of Defendant's unemployed status and limited assets, which are offset by several significant financial responsibilities, could also tempt him to return to the drug trafficking activity with which he has been charged.

years' probation.  In the present case, he allegedly was involved in a DTO involving more than

100 kilograms of cocaine and large sums of drug proceeds and, at 35 years old, he is now exposed

to a minimum term of ten years' imprisonment.  In light of the nature of the charged conspiracy

and the substantial penalty Defendant faces if convicted, this Court is not persuaded that any

amount of bond or other means of personal supervision would deter him from fleeing.  *See Chagra*,

850 F. Supp. at 359-60 (given that the defendant faced minimum term of 20 years' imprisonment

on drug conspiracy charge, the conspiracy involved large sums of cash, and evidence suggested

that he had contacts in Mexico related to his illegal drug activities, the court was not satisfied that

any possible conditions of release would reasonably assure the defendant's appearance, as

"[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that

the defendant is already fleeing").

As to community ties, it is appropriate to consider whether a defendant has ties to the

district where the prosecution is pending.  *See United States v. Bucio*, Crim. No. 5:17-055-DCR,

2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (the defendant's lack of any community,

financial, family or employment ties to the district where prosecution was pending weighed in

favor of revoking release order); *United States v. Villegas*, No. 3:11–CR–28, 2011 WL 1135018,

at *7 (E.D. Tenn. Mar. 25, 2011) ("[A]lthough the defendant has ties with the community in which

he lives in California, the defendant has no ties with this District, and the Court may consider this

fact.") (citing *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that

"community" embraces ties to the community in which the charges are brought and the community

in the United States to which the defendant has ties)); *United States v. Rivera*, 90 F. Supp. 2d 1338,

1343 (S.D. Fl. 2000) (observing that a court should consider a defendant's ties to the community

in which he faces prosecution).  In this case, Defendant has no ties whatsoever to the Western

District of Pennsylvania where this case is pending, other than his connection to co-defendant Maragh, who agents believe has fled from the United States.

The Court recognizes that Defendant has ties to the Los Angeles area where he has resided since 2002 and his mother, stepfather and children currently live there, but notes that he also has family ties to Jamaica.[11]  Defendant has traveled to Jamaica about three times in the past ten years to visit family, most recently five years ago.  Although Defendant does not travel to Jamaica extensively, the Court cannot completely discount that he has some close relatives who reside there.  In this Court's estimation, Defendant presents a risk of flight, given that he has no ties to this District, some family ties to Jamaica and he faces a substantial term of incarceration if convicted in this case.

The Court recognizes and appreciates that Defendant's mother and stepfather are willing to permit him to reside with them and essentially serve as third-party custodians to ensure that he appears for scheduled court proceedings, but has serious concerns about such an arrangement, regardless of who would assume that role.  Although Defendant's mother and stepfather are no doubt well-intentioned, the mere fact that they are willing to serve as third-party custodians does not mean that they, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense.  *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case.").

---

11      According to the Pretrial Services Report, Defendant has a half sibling who resides in Jamaica.  Additionally, Defendant states in his briefing that he has "a very small number of close relatives who reside [in Jamaica]."  (Docket No. 387 at 12).

Overall, when considering Defendant's history and characteristics (most notably, currently unemployed, no ties to the Western District of Pennsylvania and some family ties to Jamaica), this factor weighs in favor of pretrial detention. *See e.g., United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) (concluding defendant was a flight risk and revoking magistrate judge's release order, despite that defendant was a United States citizen, had no prior felony convictions, was described as a "dutiful employee" who held a job for five years, had ties to the community and agreed to post his home as security for the bond to secure his appearance, where he was indicted for serious drug conspiracy and weapons charges and had family ties to Mexico).

**D.  Nature and Seriousness of Danger to Any Person or the Community if Released**

The final factor requires consideration of the nature and seriousness of danger to any person or the community if Defendant is released.  As to this factor, the Court recently explained in the case of one of Defendant's co-conspirators that:

> [it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here.  *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs.").  Distribution of Schedule II controlled substances like cocaine have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence."  *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)).  Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.
>
> Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial." *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior.").  The Court recognizes, as others have, that strict

> conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity. *See e.g.*, *Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.").

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6, 2020).

These observations concerning the substantial risk of harm to the community posed by cocaine trafficking equally apply in Defendant's case. Based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of his continued drug trafficking activities. As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the strong weight of the evidence against Defendant, his history and characteristics, the nature and seriousness of danger to the community posed by Defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure that Defendant will not engage in drug trafficking while on release pending trial or that he will appear as required. Accordingly, detention must be ordered.

## IV.    <u>CONCLUSION</u>

Given the Court's finding that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community if he is released, the Court will lift its stay of the order of release entered by Magistrate Judge Oliver in the Central District of California on September 2, 2020, grant the Government's motion seeking revocation of

the release order, revoke Defendant's bond and order that he shall be detained pending trial or other disposition of this matter.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: December 18, 2020

cc/ecf: All counsel of record
        United States Marshal